IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSÉ ISMAEL MORALES-SANABRIA,

Defendant.

CRIM. NO.: 23-319 (SCC)

**OPINION AND ORDER**

Defendant José Ismael Morales-Sanabria ("Mr. Morales") stands charged with one count of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C) and 846 and one count of possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). *See* Docket No. 13. Mr. Morales moves to suppress all the evidence as fruit of an allegedly unconstitutional search and seizure. *See* Docket No. 34. The Government opposes on the ground that the search and seizure never ran afoul of the Fourth Amendment. *See* Docket No. 40. The Court held an evidentiary hearing regarding Mr. Morales' request to suppress and ordered the parties to file post-hearing briefs. *See* Docket No. 50. Post-hearing briefs were subsequently filed. *See* Docket Nos. 54, 55.

For the reasons discussed below, the Court **DENIES** Mr. Morales' Motion to Suppress.

## I. FINDINGS OF FACT

During the evidentiary hearing, the Government presented the testimony of Homeland Security Investigation ("HSI") Task Force Officer Juan Carlos Rivera-Rosario ("TFO Rivera"). TFO Rivera testified that, on August 23, 2023, he was conducting surveillance near Door One of the Luis Muñoz Marín International Airport (the "Airport"). Docket No. 53, pgs. 6-8. TFO Rivera's shift began at 2:00 a.m. that day. *Id.* at 7. At approximately 3:40 a.m., TFO Rivera observed an individual with braided hair and wearing blue sandals, later identified as Indio, deposit two small black suitcases for inspection at the U.S. Department of Agriculture ("USDA") checkpoint. *Id*. at 8-10, 52. After going through the checkpoint, the two suitcases were marked with green USDA inspection stickers, which was the color code for the USDA stickers in use that day. *Id*. at 9-10.

A few minutes later, TFO Rivera saw Indio on the sidewalk, outside the Airport, while still in possession of the same suitcases, which continued to display the green USDA

stickers. *Id*. at 9-10. A gold Honda Accord then pulled up in front of Indio. *Id*. at 19-20. Indio placed the two suitcases in the trunk of the gold Honda Accord. *Id*. Indio then entered the front passenger seat of the gold Honda Accord and left the Airport. *Id*. Based on these observations, TFO Rivera became suspicious that Indio was attempting to bring drugs into the Airport. *Id*. at 20-21. TFO Rivera immediately notified his supervisor, Sergeant Cesar Ortiz ("Sergeant Ortiz") and provided the license plate number of the gold Honda Accord. *Id*.

TFO Rivera remained outside. *Id*. at 21. Approximately 12 to 15 minutes later, he observed the return of the same gold Honda Accord. *Id*. TFO Rivera saw Indio exit the gold Honda Accord and remove two large, hardshell suitcases, one pink and the other black, which differed in both size and color from the ones observed earlier. *Id*. at 22. These suitcases already bore green USDA inspection stickers. *Id*. Shortly after, another individual, later identified as Mr. Morales, exited the gold Honda Accord and carried the two suitcases into the Airport. *Id*. at. 23-25.

Once inside the Airport, Mr. Morales went to an area where prepaid card machines are located. *Id.* at 25, 30. He then began walking towards the JetBlue terminal. *Id.* at 28. At this point, additional agents, including Sergeant Ortiz, Officer Angel Rivera-Colón ("Officer Rivera-Colón") and Officer Edwin Torres ("Officer Torres"), began trailing Mr. Morales. *Id.* at 27-29. While inside the Airport, Mr. Morales walked past several USDA checkpoints but did not stop at any. *Id.* at 25, 28.

Once in the JetBlue terminal area, Mr. Morales walked near the JetBlue counter area, took a phone call, and then exited the JetBlue terminal. *Id.* at 30-33. Once outside, he sat on a bench on the sidewalk. *Id*. at 33, 53. TFO Rivera, along with two other officers, approached Mr. Morales. *Id*. TFO Rivera identified himself as a law enforcement officer and requested Mr. Morales' identification. *Id*. at 33-34, 53. TFO Rivera asked Mr. Morales to move back inside the Airport so that they could talk. *Id.* at 34, 55-56. While being escorted inside, Mr. Morales was told by TFO Rivera that the agents were investigating illegal activity. *Id*. at 53. Mr. Morales then took out his cellphone, which was then taken by one of the

officers. *Id*. at 57. While Mr. Morales does not address or attempt to contest these facts, both parties have opposing views as to what happened after Mr. Morales' cellphone was taken.

TFO Rivera testified that one of the officers took Mr. Morales' phone to prevent him from contacting the criminal organization. *Id*. at 35-36. TFO Rivera and the other two agents headed towards the elevator to go up the second floor while Sergeant Ortiz lingered in the back. *Id*. at 36. TFO Rivera added that anyone could access the elevator they took by pressing on the button. *Id*. at 37. Once on the second floor, Mr. Morales was escorted to a lounge area, which was unoccupied at the time. *Id*. at 67. TFO Rivera told Mr. Morales he was not under arrest and informed him that he was going to call for a K-9 unit. *Id.* at 37-38.

Within approximately 10 minutes, the K-9 arrived with his handler, and Mr. Morales consented to the K-9 sniff by nodding his head. *Id.* at 39. The K-9 sat next to the suitcases. *Id.* The K-9's handler then informed TFO Rivera that the K-9 had marked positive. *Id.* TFO Rivera then requested Mr. Morales' permission to open the luggage, stating that a

warrant would be obtained if consent was refused. *Id*. at 39-40. Mr. Morales verbally consented, leading TFO Rivera to search the suitcases and discover narcotics. *Id*. at 40-41. Mr. Morales was consequently arrested. *Id*. at 41.

Mr. Morales declares in an Unsworn Statement[1] that, after the officers approached him outside the JetBlue terminal, he was taken to a non-public area of the Airport while they waited for a K-9 unit to arrive. *See* Docket No. 34-1. The officers did not tell him he was free to leave. *Id.* at 2. After the K-9 unit arrived and sat next to his suitcases, the officers ordered Mr. Morales to open them. *Id.*

## II. ANALYSIS

The threshold question the Court must answer is whether HSI TFO agents had reasonable suspicion to conduct a *Terry* stop. If the agents had reasonable suspicion, the Court must then determine whether the investigatory stop turned into an illegal arrest without probable cause.

---

[1] Mr. Morales did not testify at the evidentiary hearing. Instead, he provided an Unsworn Statement under penalty of perjury. See Docket 34-1.

### A. *Reasonable Suspicion*

A *Terry* stop is a specific type of Fourth Amendment seizure that allows an officer to briefly detain an individual to investigate possible criminal activity. *United States v. Harrington*, 56 F.4th 195, 201 (1st Cir. 2022). This type of seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away[.]" *Terry v. Ohio*, 392 U.S. 1, 16 (1968). While Fourth Amendment safeguards apply to *Terry* stops, probable cause is not required. *Id*. Instead, a police officer must possess reasonable suspicion of criminal activity at the inception of the stop. *United States v. Howard*, 66 F.4th 33, 44 (1st Cir. 2023); *see also United States v. Carmona*, 103 F.4th 83, 90 (1st Cir. 2024).

To assess whether reasonable suspicion exists, the Court must evaluate the totality of the circumstances and determine whether officers held a particularized, objective basis to suspect the individual of criminal activity. *See United States v. Cortez*, 449 U.S. 411, 417-418 (1981); *see also United States v. Qin,* 57 F.4th 343, 349 n. 7 (1st Cir. 2023). To assess whether circumstances yielded a particular suspicion, two elements must be present before a stop is permissible. *See*

| United States of America v. Morales-Sanabria | Page 8 |
|---|---:|

*Cortez*, 449 U.S. at 418. First, the assessment must consider all relevant circumstances. This analysis relies on objective observations, available police reports, and patterns or modes of operation of certain kinds of lawbreakers. *Id*. "[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id*. This process is not about absolute certainty but about probabilities. *Id.* The second element consists of a demand of specificity in that "the process . . . must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id*.

The Government argues that, based on the totality of the circumstances, the HSI TFO agents had reasonable suspicion that Mr. Morales was involved in criminal activity. *See* Docket No. 54, pg. 3. TFO Rivera testified to several key observations, including his initial sighting of Indio, who passed two suitcases through the USDA checkpoint, which were marked with green USDA stickers and subsequently departed the Airport. *See* Docket No. 53, pgs. 18-20. A few minutes later, TFO Rivera observed the same gold Honda Accord return to the Airport. *Id*. at 21. He then saw Indio

| United States of America v. Morales-Sanabria | Page 9 |
|---|---:|

remove two different suitcases from that gold Honda Accord, both of which were already identified with green USDA stickers. *Id*. TFO Rivera further observed Mr. Morales enter the Airport with these suitcases and proceed to the JetBlue counter, bypassing five different USDA checkpoints. *Id*. at 25.

TFO Rivera explained that these observations led him to recognize a pattern commonly associated with criminal organizations' *modus operandi*. *Id*. at 77. With nearly two decades of experience in Airport-based law enforcement, *see id.* at 6-7, TFO Rivera asserted that his objective observations pointed to a potential drug trafficking operation. Notably, Mr. Morales has not contested these observations nor explained why he never passed the suitcases through the USDA inspection checkpoint. *See* Docket Nos. 34, 55. The Court finds TFO Rivera's testimony credible as to the existence of reasonable suspicion to perform a *Terry* stop.

### B. Probable Cause

Investigative detentions can violate the Fourth Amendment if they lack probable cause. *Florida v. Royer*, 460 U.S. 491, 500 (1983). Such detentions are allowed only if law enforcement interests "warrant a limited intrusion on the

personal security of the suspect." *Id*. The duration and scope of the detention must be limited to what is necessary to address the officer's suspicion. *Id*. Investigative methods should be "be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id*. It is the Government's burden to prove that the seizure was reasonable in both scope and duration to satisfy the conditions of an investigative seizure. *Id*.

Mr. Morales argues that even if the HSI TFO agents had reasonable suspicion, the stop escalated into a detention without probable cause when agents seized his phone and identification and moved him to a lounge on the Airport's second floor. Docket No. 55, pg. 1. The Government sustains that safety concerns called for the intervention to take place inside the Airport and that Mr. Morales was escorted to "a public area, where everyone is free to access[.]" Docket No. 54, pg. 7. The Government also contends that removing Mr. Morales' cellphone was an appropriate and limited intrusion amidst concerns that he would alert the criminal organization of his detention. *Id*. at 9.

To determine if the officers' actions were justified, the Court must consider whether the facts available to the officer at the time would "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 21-22. In this case, TFO Rivera explained that his suspicion of criminal drug activity warranted moving Mr. Morales inside the Airport for further questioning. Docket No. 53, pg. 34. TFO Rivera suspected a member of the criminal organization might return to pick up Mr. Morales and take any action necessary to recover the drugs. *Id*. at 34. The probability that a look-out might attempt to interrupt the stop and recover the drugs warranted agents to relocate Mr. Morales to a lounge area on the Airport's second floor. TFO Rivera further clarified there were many people transiting the Airport that day. *Id.* at 31. Therefore, the Court finds that the Government has sufficiently identified specific facts that support TFO Rivera's "security concerns", as the reason for why Mr. Morales was moved inside the Airport and subsequently to a lounge area on the second floor of the Airport.

Moreover, TFO Rivera's concern that members of the criminal organization might seek out the drugs was confirmed during the suppression hearing. During the same, the Government introduced an exhibit showing Indio inside the JetBlue terminal, looking toward Mr. Morales as he was being placed into the elevator to the second floor. Docket No. 54, pg. 10. This sighting of Indio confirms TFO Rivera's suspicion that members of the suspected criminal organization might attempt to retrieve the drugs. This sighting also supports the reasonableness of the seizure of Mr. Morales' cellphone.

Relocating Mr. Morales to the lounge area on the second floor of the Airport, which could be accessed by anyone who pressed the elevator button, was a necessary measure to ensure the safety of the officers and the public.[2] Requiring TFO Rivera to conduct the investigation within the crowded gate area would have posed an undue risk to his safety and that of others. *Terry*, 392 U.S. at 23. Furthermore,

---

[2] By presenting photos of the empty lunge area on the second floor of the Airport, Mr. Morales attempted to argue that it was a private area. However, he provided no details as to the time and day that the pictures were taken.

the fact that Mr. Morales was told on two occasions that he was not under arrest and was detained for merely 9 to 10, minutes, supports the Court's finding that the brief intrusion was justified. Therefore, the Court concludes that the agent's investigative actions did not escalate into an unlawful detention outside the parameters set forth in *Terry*. Notably, the is no indication on the record that Mr. Morales was coerced into following the agents inside the Airport and, eventually, to the lounge area on the second floor of the Airport.

### C. *The K-9 Sniff*

The Fourth Amendment does not prohibit law-enforcement officers from temporarily detaining personal luggage for exposure to a trained dog based on reasonable suspicion that the luggage contains narcotics. *See United States v. Place*, 462 U.S. 696 (1983). A dog sniff conducted in these circumstances is not a search within the meaning of the Fourth Amendment. *United States v. Quinn*, 815 F.2d 153, 159 (1st Cir. 1987). Once the dog has alerted to the presence of narcotics, there is probable cause to conduct a search. *See United States v. De Los Santos Ferrer*, 999 F.2d 7, 10 (1st Cir.

| United States of America v. Morales-Sanabria | Page 14 |
|---|---|

1993); *See also United States v. Brown*, 500 F.3d 48, 57 (1st Cir. 2007).[3]

TFO Rivera's reasonable suspicion that Mr. Morales was engaged in criminal activity warranted the use of a trained dog to sniff out his suitcases.[4] The K-9's alert of narcotics provided probable cause to conduct a search of Mr. Morales' suitcases.

### D. Consent to Search

It is well established that searches and seizures must be supported by probable cause and conducted pursuant to a warrant. *Katz v. United States*, 389 U.S. 347, 357 (1967). That said, a warrant is not required if an individual with apparent authority consents to a search. *See United States v. Jones*, 523

---

[3] The K-9's reliability was not contested during the evidentiary hearing nor in the post-hearing briefs.

[4] The Court notes that Mr. Morales does not seem to contest the validity of his consent to the K-9 sniff. *See* Docket Nos. 34, 55. At the evidentiary hearing, TFO Rivera testified that while waiting for the K-9 unit, he informed Mr. Morales that he was not under arrest. Docket No. 53, pg. 38. According to TFO Rivera, Mr. Morales walked around and then sat down again. *Id*. After approximately 4-5 minutes, the K-9 arrived, and TFO Rivera asked Mr. Morales for consent to allow the K-9 to check the suitcases, to which Mr. Morales consented with a head nod. *Id*. at 39. Mr. Morales does not contest his consent to the K-9 sniff, nor does the record suggest any refusal of consent.

F.3d 31, 37 (1st Cir. 2008). The Government bears the burden of showing that consent was freely and voluntarily given when justifying a warrantless search based on consent. *Id.*

Here, the Government further argues that after the K-9 marked the suitcases, Mr. Morales consented to a search of the luggage. TFO Rivera testified that Mr. Morales asked if he was being ordered to open the suitcase. Docket No. 53, pg. 40. TFO Rivera responded that, if Mr. Morales did not authorize the opening of the bags, they would get an arrest warrant. *Id*. Mr. Morales does not seem contest this fact as he cites this exact testimony in his post-hearing brief. Docket No. 55, pg. 4. The Court finds that Mr. Morales consented to the search based on TFO Rivera's clear and unchallenged testimony and Mr. Morales' failure to develop an argument or marshal evidence to the contrary.

### E. *Exclusionary Rule*

Mr. Morales moves to suppress the evidence as tainted fruit of an illegal arrest. Docket No. 34, pg. 12. However, the Court has already determined the legality of Mr. Morales' temporary detention in light of the safety concerns that warranted a limited intrusion on his privacy interests. The

| United States of America v. Morales-Sanabria | Page 16 |
|---|---:|

legality of his detention consequently upholds the validity of his consent to search his suitcases. The Court thus finds the evidence does not warrant suppression.

### III. CONCLUSION

Having carefully examined the arguments raised by the parties, Mr. Morales' Motion to Suppress at Docket No. 34 is **DENIED**.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 10th day of June 2025.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE